COMMONWEALTH OF MASSACHUSETTS
TRIAL COURT OF THE COMMONWEALTH

Middlesex, ss.                                      Superior Court Department
                                                    Civil Action No. 2081-CV-02483

SCOTT CULLINANE,
                    Plaintiff

v.                                                  **AMENDED COMPLAINT AND DEMAND
                                                    FOR JURY TRIAL**

TOWN OF CONCORD
                    Defendant                       **RECEIVED**
                                                    06/30/2023

## THE PARTIES

1. Scott Cullinane ("Cullinane") is a natural person residing in Lexington, Middlesex County, Massachusetts.

2. The Town of Concord, Massachusetts ("Town") is a duly established municipality in the Commonwealth, located in Middlesex County, Massachusetts.

## FACTS COMMON TO ALL COUNTS

3. Cullinane was a long-time employee of the Town.

4. Specifically, since 1997 Cullinane was employed as a grounds specialist performing tree maintenance and removal, grounds work, and aerial lift operation work, a position in the Town's Department of Public Works ("DPW").

5. In his role as a grounds specialist, Cullinane was required to be on call for emergencies, such as tree removal due to storm damage.

6. As part of his employment agreement, Cullinane was supposed to be paid an extra amount of money for every call to which he responded under certain circumstances.

ac

7. In October 2017, the Department of Public works was overseen by Daniel Rowley ("Rowley") and Rowley's assistant, Keith Baldinger ("Baldinger").

8. On a day in the late fall of 2017, on or about October 29, Cullinane was not scheduled to work but was on call for the Town.

9. On or about that date, Cullinane was called to a job to remove a tree.

10. Cullinane completed the job and after being cleared from this call by his supervisor, Cullinane left the site and proceeded home.

11. On the same night after Cullinane returned home, he was called again to another job for the Town.

12. Cullinane went to the second job, completed the work, and went home.

13. At the end of the week, Cullinane put in for payment for the two calls.

14. Cullinane reasonably believed that payment for the two calls was owed to him as wages under his employment agreement with the Town.

15. After Cullinane submitted his timesheet, Baldinger came into work area where Cullinane was sitting, slammed the time sheet paper on Cullinane's desk, and stated "we are not fucking paying you for this."

16. Cullinane responded that he had been called out twice and these were wages due under the agreement.

17. Baldinger repeated that he was not paying Cullinane for the two calls, to which Cullinane responded that he had to, it was "illegal" and that he had worked the calls and would complain to the Town administrators about this pay issue.

18. Indeed, Cullinane immediately verbally complained about the above referenced events to Pete Flynn ("Flynn"), a Town department manager.

19. On the same day, Cullinane complained about the above-referenced events by reporting them by phone to the Town's Human Resource Director, Amy Foley ("Foley").

20. Cullinane advised both Flynn and Foley that his wages were due and owed to him under his employment agreement with the Town.

21. Foley stated that she would look into it.

22. Days later, Flynn advised Cullinane to come into the lunchroom at work early to once again discuss this pay issue.

23. Cullinane's supervisors, Baldinger and Rowley, as well as the Director of Public Works, Rich Reine ("Reine"), were in attendance.

24. During this meeting, Reine told Cullinane that "we are going to pay you" but there is not going to be a next time.

25. At this meeting both Baldinger and Rowley were visibly agitated and angry.

26. At one point after this meeting on the same day, Baldinger threatened Cullinane and stated, "the next time I am going to make you sit there for eight hours even if it takes you fifteen minutes and pay you for four."

27. Cullinane stated once again that such was not legal, nor would it motivate him to come into work in the middle of the night to take care of an emergency call.

28. The Town ultimately paid Cullinane for this work, but thereafter his supervisors, Baldinger and Rowley, gave Cullinane ugly dagger-like looks as well as the cold shoulder.

29. On or about December 5, 2017, Cullinane was working for the Town at the direction of his supervisors cleaning up assorted piles of scrap in the Town yard that the Town was throwing in the trash.

30. Doing this work, Cullinane was working under Jeffrey Koranda ("Koranda"), a line supervisor with the Town's Highway Department.

31. Koranda directed Cullinane to put the trash in a dumpster so that it could be taken away.

32. In doing this work, Cullinane came across several items of scrap that he believed would be useful to him in his home and as scrap metal.

33. Given that the items were just going to be thrown away, Cullinane asked Koranda if he could take some of the pieces.

34. Koranda told Cullinane to take whatever he wanted because it was just going to be thrown out, but to do so on his own time.

35. Specifically, Koranda told Cullinane to "take what you want" and confirmed that it was "trash."

36. With Koranda's permission, Cullinane took the trash and placed it in the back of his truck during his lunchtime which was "his own time."

37. Cullinane did not conceal or hide this trash and it remained in the back of his truck open and visible from December 7, 2017.

38. At some point, Rowley and Baldinger saw that Cullinane had the scrap in his truck.

39. On or about December 7, 2017, Rowley reported to the Town's Chief of Police, Joseph O'Connor ("Chief O'Connor"), that Cullinane was stealing the Town's property.

40. Neither Rowley nor Baldinger ever asked Cullinane if he had permission to take the items.

41. In fact, Rowley and Baldinger never asked Cullinane anything about the items before Rowley reported this event as a "crime" to Chief O'Connor.

42. At the time Rowley and Baldinger reported this "crime," the items had been in Cullinane's truck for two days and no one else from the Town had said anything to Cullinane, despite

4

the fact that Cullinane was going back to the Town yard to continue the clean up each day and the items were open and obvious.

43. As a result of Rowley's report to O'Connor, on December 17, 2017, Cullinane was arrested in a highly public and unusual manner.

44. Cullinane was pulled over by a police cruiser while on his way into the DPW about 500 yards from the DPW.

45. Cullinane was placed in handcuffs by the arresting officers and placed in a back of a cruiser and transported to the jail.

46. Officers in the police department hearing of the order to arrest Cullinane refused to participate in the call, and the arresting officers apologized for their part in this plan.

47. Upon information and belief, the scrap had no value and, in any event, had a value of less than $250.00.

48. Upon information and belief, it was custom and practice for the Town to seek a criminal complaint or show cause on such "crimes" and not to place a person under arrest in the manner Cullinane experienced.

49. At all times relevant, the Town's agents did not act in good faith, nor did they have a good faith belief in its report of a "crime."

50. The Town's agents, with improper motive, sought application for a criminal complaint drafted against Cullinane.

51. The hearing on their application for a criminal complaint proceeded on the Monday after the December 17, 2021, arrest.

52. Based on the evidence presented at hearing, which mirrored the facts as stated above, the magistrate who heard the matter declined to issue a criminal complaint, calling the situation "ridiculous."

53. The magistrate also made statements that should have alerted the Town that its allegations of a crime were frivolous and fraudulent and should not be pursued.

54. Despite the magistrate's colloquy, the Town continued to correspond with Cullinane, allowing the threat of future criminal action to linger over his head.

55. On December 7, 2017, the Town issued other legal process against Cullinane, including a No Trespass notice that prohibited Cullinane from "non-public areas of Town of Concord Facilities, grounds and job sites."

56. On or about December 8, 2017, the Town also suspended Cullinane from his job pending an "investigation" concerning the removal of the trash.

57. Rowley and Baldinger maliciously and falsely accused Cullinane of theft in retaliation for Cullinane's wage claim/petitioning activity.

58. Based on information and belief, the manner of the arrest was a deviation from routine Town and police practices, especially in light of the fact that Cullinane was a longstanding, highly respected "integral" part of the Town DPW team.

59. As a result of the Town's above conduct resulting from Cullinane's exercised his wage and hour rights under Chapter 149, Cullinane suffered personal injuries (workers compensation injury), including but not limited to insomnia, high blood pressure, shortness of breath, dizziness, nausea, loss of appetite, and other gastrointestinal issues.

60. Cullinane also suffered significant emotional distress.

61. Cullinane's physical and emotional condition prevented him from working.

6

62. As a result, Cullinane sought a medical leave of absence.

63. On December 19, 2017, the Town placed Cullinane "provisionally" on a leave of absence under the Family and Medical Leave Act.

64. On or about December 29, 2017, Cullinane notified the Town's Human Resources Director of his workers compensation injuries arising out of the above-referenced conduct.

65. The Town acknowledged on January 16, 2018, that the claim had been "filed electronically" with the state and that the insurer had already "denied" the claim.

66. While Cullinane was out on his leave of absence, the Town continued to retaliate, harass, and threaten him.

67. On May 1, 2018, the Town notified Cullinane by way of a letter that Public Works Director Reine recommended his termination based on "job abandonment" and notified Cullinane that they intended to have a hearing on the matter.

68. In this same letter, the Town again alluded to its ongoing "investigation" and criminal prosecution, and its "right to act on that matter if circumstances warrant."

69. The letter instructed that Cullinane could not bring an attorney to this job abandonment hearing.

70. The letter was ongoing retaliation due to fact that Cullinane exercised his wage and hour rights under Chapter 149 and for his complaints to both management and Human Resources.

71. The Town caused the constructive discharge of Cullinane and/or terminated Cullinane in in May 2018 in violation of a well-defined public policy.

72. No reasonable person could or would have returned to this workplace given the Town's conduct and ongoing threats of malicious prosecution, and no reasonable person with an

ongoing threat of criminal prosecution would have "testified" in the Town's planned hearing referenced in its May 1, 2018, letter.

73. After the letter of May 1, 2018, Cullinane knew he would not get due process for any of the legitimate concerns he had and resigned.

74. The Town's accepted Cullinane's "resignation" and discharged him, advising him that their investigation results would be placed in his personnel file.

75. The Town knew or should have known that Cullinane's absence from work was caused by the Town's illegal, improper, and retaliatory conduct.

76. At all times relevant, Cullinane had met or exceeded his performance standards.

77. Cullinane's constructive discharge/termination was in retaliation for claiming/reporting his rightfully owed wages or, in the alternative, for his petitioning activity surrounding his right to be paid for his work and his right to be compensated for injuries sustained arising out of his complaint process.

78. At all times relevant, there was a strong public policy supporting the right to be paid for work performed and/or the right to complain of the failure to be paid for work performed.

79. At all times relevant, the Town had previously been sued specifically for wage and hour violations and for retaliation in response to complaints for failure to pay wages.

## COUNT I
## Wrongful Termination in Violation of Public Policy

80. Cullinane repeats and re-alleges paragraphs 1-79 above and incorporates same by reference as if originally stated herein.

81. Cullinane complained to agents of the Town, his employer, about wages rightfully owed to him under state and federal law.

82. At all times relevant, Cullinane had a good faith belief that these monies were owed and were wages within meaning of the law.

83. After Cullinane made the complaints, the Town retaliated against Cullinane by wrongfully accusing him of a crime without probable cause and in bad faith, arresting him in a highly unusual and public manner, treating him poorly while out on medical leave, issuing a no trespass order, and ultimately terminating him.

84. By these actions, the Town constructively discharged/terminated Cullinane in violation of a well-defined public policy.

85. As a result, Cullinane suffered severe emotional distress, bodily injuries, economic harm, lost wages, and earning capacity, incurred attorney fees, and suffered other damages.

## COUNT II
## Unlawful Retaliation in Violation of the Fair Labor Standards Act of 1938, 29 U.S.C. § 215(a)(3)

86. Cullinane repeats and re-alleges paragraphs 1-85 above and incorporates same by reference as if originally stated herein.

87. At all times relevant, the Town employed Cullinane within the meaning of the Fair Labor Standards Act ("FLSA").

88. The Town is a municipal corporation.

89. 29 U.S.C. § 215(a)(3) prohibits an employer from discharging or discriminating against an employee for exercising rights under the FLSA.

90. Cullinane complained to agents of the Town, his employer, that he had not been paid wages rightfully owed to him under the FLSA.

91. At all times relevant, Cullinane had a good faith belief that these monies were owed and were wages within the meaning of the law.

92. After Cullinane made those complaints, the Town retaliated against Cullinane by wrongfully accusing him of a crime without probable cause and in bad faith, arresting him in a highly unusual and public manner, treating him poorly while out on medical leave, issuing a no trespass order, and ultimately terminating him.

93. The Town's conduct violated 29 U.S.C. § 215(a)(3).

94. As a result of the Town's retaliatory conduct, Cullinane suffered severe emotional distress, bodily injuries, economic harm, lost wages, and earning capacity, loss of reputation, incurred attorney fees, and suffered other damages.

## COUNT III
### Deprivation of Rights, 42 U.S.C. § 1983

95. Cullinane repeats and re-alleges paragraphs 1-94 above and incorporates same by reference as if originally stated herein.

96. At all times relevant, Baldinger, Rowley, and Reine were supervisory agents of the DPW of the Town in relation to the above referenced allegations.

97. The Town is a municipal corporation.

98. At all times relevant, The Town's supervisory agents, Reine, its human resource agents, and others, had an obligation to supervise, train and discipline its agents: (a) to prevent violations of clearly established state and federal laws regarding pay (payment for work performed); and (b) to protect employees from retaliation from its agents arising out of good faith complaints concerning state and federally protected wage rights.

99. The Town had prior notice of similar wage and hour/retaliation complaints and, specifically, Cullinane's complaints that it failed to act upon the same in any manner.

100. The Town's failure to train, supervise, or discipline its agents despite notice in areas of the law that are federally/constitutionally protected such as the right to pay, demonstrates deliberate indifference.

101. The Town, acting under color of law, deprived Cullinane of his federally protected right to pay and his rights to due process as protected by the Fourteenth Amendment of the United States Constitution.

102. The Town's conduct demonstrated a deliberate indifference to Cullinane's rights, including his rights to: (a) pay under federal and state laws; (b) his right to petition or complain about the Town's refusal to pay him in violation of state or federal law; (c) Cullinane's right to complain about the Town's conduct as referenced above and to be free of threats intimidation or coercion in connection with his request for payment for time worked; (d) Cullinane's right to due process in connection with public employment; and (e) Cullinane's right to be free from an arrest made without probable cause and in bad faith with the motive to retaliate against Cullinane for his constitutionally and federally protected speech.

103. Cullinane had a right to be free from retaliatory conduct and the right to be free from a retaliatory arrest which violated the Fourth and Fourteenth Amendments of the United States Constitution.

104. The Town's conduct concerning the arrest not only lacked good faith, but also lacked any form of due process owed to Cullinane.

105. The Town's conduct as described above demonstrated and was part of the Town's custom, policy, and official practice.

106. The Town's conduct, in connection with its response to Cullinane's complaint about his wages, his arrest and his ultimate termination, was conscience shocking and exhibited not

11

only deliberate indifference to Cullinane's rights but intentional interference with the Cullinane's substantive and procedural due process rights.

107. As such, the Town deprived Cullinane of a federally protected right in violation of 42 U.S.C. § 1983.

108. As a result of the Town's violation of 42 U.S.C. § 1983, Cullinane suffered harm including retaliatory arrest, personal injuries, emotional distress, constructive discharge, violation of due process, harm to reputation, incurred attorney fees and otherwise suffered harm.

**WHEREFORE,** Plaintiff, Scott Cullinane, demands judgment as against Defendant, Town of Concord, in an amount the Court deems just, including but not limited to equitable relief for emotional distress damages, damages to reputation, personal injury in connection with retaliatory and unconstitutional arrest, reinstatement with back pay, front pay, loss of retirement and other benefits, and any other relief that this Court deems appropriate, including compensatory damages, punitive damages, attorney fees, and interest.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL TRIABLE ISSUES.**

PLAINTIFF, Scott Cullinane, on his behalf and on behalf of all other similarly situated individuals

Date: June 30, 2023

*/s/ Katharine E. Shove*

Lisa Brodeur-McGan (BBO# 556755)
Katharine E. Shove (BBO# 705877)
Brodeur-McGan, P.C.
1380 Main Street, Suite 202
Springfield, MA 01103
(413) 735-1775; Fax: (413) 735-1772
lbm@brodeurmcgan.com
kes@brodeurmcgan.com

## CERTIFICATE OF SERVICE

      I, Katharine E. Shove, do hereby certify that I made service of the foregoing document on this 30th day of June, by email AND/OR first class mail, postage prepaid, to: Justin L. Amos, Esq. (jamos@piercedavis.com), Pierce Davis & Perritano, LLP, 10 Post Office Square, Suite 1100N, Boston, MA  02109.

                                                         */s/ Katharine E. Shove*

                                                         Katharine E. Shove