**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————

| | |
|---|---|
| SCOTT CULLINANE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      No. 1:23-cv-11526-JEK |
| | ) |
| TOWN OF CONCORD, | ) |
| | ) |
| Defendant. | ) |
| | ) |

———————————————————

## <u>MEMORANDUM AND ORDER ON</u><br><u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**KOBICK, J.**

Plaintiff Scott Cullinane previously worked as a grounds specialist for the Town of Concord, the defendant in this action. In October 2017, after responding to two after-hours calls to remove fallen trees, Cullinane made several complaints to his superiors about his entitlement to overtime wages for that work. Five weeks later, the Town referred Cullinane to the Concord Police Department over allegations that he stole the Town's scrap metal, and that referral precipitated Cullinane's arrest and placement on administrative leave. After eventually resigning his position, Cullinane filed suit, bringing claims of retaliation in violation of the Fair Labor Standards Act ("FLSA"), wrongful termination in violation of public policy, and violations of his First Amendment speech and Fourteenth Amendment due process rights. Pending before the Court is the Town's motion for summary judgment on all counts. For the reasons that follow, the motion will be granted with respect to Cullinane's wrongful termination and constitutional claims, but his retaliation claim under the FLSA may proceed to trial.

## BACKGROUND

The following facts, unless otherwise noted, are either undisputed or recounted in the light most favorable to Cullinane, as the non-moving party. *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023).

Cullinane began working for the Town of Concord's Department of Public Works ("DPW") in 1997. ECF 31, ¶ 1. He was employed as a grounds specialist whose responsibilities included tree maintenance and removal, grounds work, and aerial lift operation work. *Id.* ¶ 2. Cullinane's position required him to be on call for emergencies, including tree removal due to storm damage. *Id.* ¶ 3. During the relevant period, his regular rate of pay was $30.01 per hour, *id.* ¶ 15, and he worked over 40 hours per week, ECF 44-3.

## I.    The October 2017 Callbacks.

At 10:48 p.m. on October 29, 2017, Cullinane responded to an emergency call to remove a fallen tree in Concord. ECF 31-2, at 1; ECF 31, ¶ 5. After completing the tree clean-up, which took a little over an hour, he followed protocol and called the Concord Police Department ("CPD") to notify them that he was done. ECF 31, ¶¶ 7, 9. CPD informed him that there were no other fallen trees and that he was cleared to go home. *Id.* ¶ 8. Shortly after arriving home, Cullinane received another emergency call at 12:12 a.m. to remove another fallen tree. ECF 31-2, at 1; ECF 31, ¶¶ 10-12. He left his home again to respond to this second job, which lasted over an hour. ECF 31, ¶¶ 11-13. Once cleared from this job at 1:25 a.m., Cullinane stayed in Concord to await the start of his regular shift. *Id.* ¶¶ 14, 32. Cullinane worked no more than four hours between the two calls. *Id.* ¶ 31.

For emergency calls such as these, Section 9.3 of the Town's Personnel Bylaw provided that Cullinane would be compensated "a minimum of four (4) hours pay for such work when the assignment or recall was made less than eight (8) hours prior to the scheduled start time." ECF 42-

3, at 12; ECF 31, ¶¶ 4, 17. There is no dispute that both tree removal calls were made less than eight hours before the start time of Cullinane's next shift on the morning of October 30, 2017, and that these tree removal calls were overtime work eligible for payment at the overtime rate. ECF 44-2, 44-3. Cullinane therefore assumed that, pursuant to Section 9.3 of the Bylaw and consistent with the Town's past practice, he would be paid at an overtime rate for eight hours—that is, four hours for each of the two calls he received that night. ECF 31, ¶¶ 18, 25.

The next morning, however, Keith Baldinger, assistant superintendent of the Highway & Grounds Unit of DPW, threw Cullinane's time sheet on the table in front of him and told Cullinane, "'I'm not effing paying you for this.'" ECF 42-1, at 79; ECF 31-3, ¶ 2; ECF 31, ¶ 19. Cullinane did not know whether Baldinger meant, by this comment, that Baldinger would pay him for only one call or that Baldinger would not pay him at all. ECF 31, ¶¶ 20, 51. Cullinane told Baldinger that because he had been called twice for tree removal, he was owed eight hours of overtime pay and "it was illegal for the Town not to pay [him]." ECF 31-3, ¶ 3; ECF 31, ¶¶ 24, 28, 50. At his deposition, Baldinger testified that he did not recall this conversation with Cullinane, and he denied ever refusing to pay Cullinane for any time spent on the two calls. ECF 42-4, at 36:24-37:16.

After his conversation with Baldinger, Cullinane complained to Peter Flynn, then the supervisor of public works, that he was entitled to pay for two callbacks. ECF 31, ¶ 53. Flynn told Cullinane to speak with human resources director Amy Foley. *Id.* ¶ 54; ECF 42-1, at 87-88. Cullinane did later speak with Foley. ECF 31, ¶ 54. Baldinger also shared Cullinane's complaint with Dan Rowley, the superintendent of DPW, and either Rowley or Richard Reine, the director of DPW, relayed information about the dispute to Foley. ECF 31, ¶ 24; ECF 31-5, at 30:21-31:2; ECF 42-4, at 37:9-12. Cullinane's complaints to Baldinger, Foley, and Flynn were oral, not in writing, and did not specifically mention the FLSA. ECF 31, ¶¶ 23, 29.

At her deposition, Foley recalled that Cullinane's supervisors believed that Cullinane was entitled to only four hours of pay because he had been dismissed by CPD, not his supervisors, and was therefore still on call when he received the second call. ECF 31-5, at 32:22-33:2; ECF 31, ¶ 55. Nevertheless, the Town informed Cullinane no later than November 15, 2017 that it would pay him for eight hours, or two callbacks, at the overtime rate, but it clarified the procedure for ending a callback shift going forward. ECF 31-3, ¶ 6; ECF 31-4, at 2-3; ECF 31, ¶¶ 30, 56, 58.

## II.   **Cullinane's December 2017 Arrest.**

On December 6, 2017, DPW conducted a cleanup at the DPW yard. ECF 31-6, at 12:8-22; ECF 31, ¶ 33. Working under Jeffrey Koranda, a crew leader in the Town's highway department, Cullinane was tasked with cleaning up piles of scrap metal that the Town was throwing in the trash. ECF 31, ¶¶ 33, 59-62; ECF 31-6, at 9:13-19, 12:8-13:20. Cullinane asked Koranda what the Town was doing with the scrap metal, and Koranda told him that it was trash that was being thrown away. ECF 31, ¶ 63; ECF 42-1, at 121:22-124:3. At his deposition, Koranda explained that he had learned this from Bill Holt, a mechanic, who had told him that the items were trash and should be gathered in a pile next to a dumpster. ECF 31-6, at 12:20-13:20; ECF 31, ¶ 60. When Cullinane shared his idea to repurpose some of the scrap metal, Koranda told him: "[Y]ou know the policy here, past practice, do it on your own time at lunch time, no problem." ECF 42-1, at 119:2-15. Cullinane did so, moving a few three-foot pieces of snow blades and two lift arms into the unconcealed bed of his truck over his lunch break. *Id.* at 123; ECF 31-3, ¶ 7; ECF 31, ¶¶ 34-35, 45.

Later that day, Holt, seeing the items in Cullinane's truck, informed DPW superintendent Rowley that Cullinane had scrap metal from the yard in his truck. ECF 31, ¶ 64. Rowley sent photographs of the metal in Cullinane's truck to DPW director Reine. *Id.* ¶¶ 36, 64; ECF 31-5, at 49:10-52:1. Reine received the images when he was in a meeting with human resources director Foley and other department heads. ECF 31, ¶ 64; ECF 31-5, at 49:19-50:4. He discussed the matter

4

with Foley; Joseph O'Connor, Chief of the Concord Police Department; and Christopher Whelan, the town manager. *Id.*; ECF 31-5, at 52:6-17. The group expressed concern that Cullinane "seemed to be taking it for his own personal use and that it was specifically intended to be something that the town was selling." ECF 31-5, at 52:20-24. Believing the metal to have "significant value," they decided that the situation "needed police involvement—this was not just a small employment matter—and, therefore, the police should handle this." *Id.* at 53:1-15; ECF 31, ¶ 64. No Town employee spoke with Cullinane or Kolanda before deciding that the situation should be handled by the police. ECF 31, ¶¶ 37, 65.

On December 7, 2017, the following day, Chief O'Connor informed Brian Goldman, a detective sergeant at CPD, that he had received a report that Cullinane was stealing scrap metal from the DPW yard. ECF 31, ¶ 38. Later that morning, at Chief O'Connor's direction, Goldman met to discuss the issue with Rowley and Baldinger, who told him that Cullinane was taking surplus metal from the Concord DPW. *Id.* ¶¶ 39-41. Goldman then spoke to Assistant District Attorney Rob Neltzer, and the two concluded that there was probable cause for Cullinane's arrest. *Id.* ¶ 43; ECF 42-5, at 34:8-35:2.

When Cullinane returned to work at the DPW yard on December 7, 2017, the scrap metal was still lying unconcealed in his truck bed. ECF 31, ¶¶ 46, 66; ECF 31-3, ¶ 7. Detectives Kallie Koppenal and James Forten were stationed outside the DPW yard to surveil Cullinane's truck. ECF 31, ¶ 67; ECF 42-5, at 36:23-38:23. When Cullinane left work around 3:20 p.m., Koppenal and Forten stopped his vehicle at Goldman's direction, and Goldman questioned Cullinane about the metal in his trunk. ECF 31, ¶ 68; ECF 42-1, at 28, 110-12; ECF 42-5, at 36:23-40:23. Cullinane denied stealing from DPW, explaining that he believed he had permission to take the scrap and offering to take it back. ECF 42-5, at 40:6-10. Nevertheless, the officers arrested him and brought

5

him into the police station, where he was questioned and held until his bail was paid. ECF 31, ¶ 44; ECF 42-1, at 132:2-135:18; ECF 42-5, at 44:12-58:19. At the time of the arrest, Goldman was not aware of Cullinane's wage dispute with the Town regarding his October 2017 callbacks. ECF 31, ¶ 47.

After Cullinane's arrest, CPD officers interviewed Koranda, who confirmed that he had told Cullinane that the material next to the dumpster was trash and informed them that taking the scrap metal would not be unusual or a violation of any policy. ECF 31, ¶¶ 71-73; ECF 31-6, at 15:5-18:15. The officers also determined that the value of the metal in Cullinane's truck totaled about $67. ECF 31-13, at 13; ECF 42-5, at 43:3-19.[1]

The next morning, CPD applied for a criminal complaint charging Cullinane with larceny under $250. ECF 31, ¶ 75; ECF 42-5, at 59:2-60:14. The clerk magistrate refused to sign off on the complaint at the show cause hearing, however, and ultimately no criminal charges were pursued. ECF 31, ¶¶ 76-77; ECF 42-5, at 60:15-63:7.

## III.    The Town's Investigation.

On December 7, 2017, Cullinane was placed on paid administrative leave and issued a no-trespass order, pending an investigation into the allegations that he had stolen DPW property. ECF 31, ¶ 69; ECF 31-10; ECF 31-12. The no-trespass order forbade him from entering "[n]on-public areas of Town of Concord facilities, grounds, and job sites," on penalty of arrest, fine, and imprisonment. ECF 31-12.

The investigation was conducted by Michael Gardner, an independent contractor for the Town. ECF 31, ¶ 84; ECF 31-7. On December 12, 2017, Foley ordered Cullinane to appear for an

---

[1] The metal in Cullinane's truck weighed 2,230 pounds and was valued at $.03 cents on the pound. ECF 31-13, at 13; ECF 42-5, at 43:3-19.

6

investigatory interview the next day to discuss the allegations against him. ECF 31, ¶ 85; ECF 31-7. Cullinane's attorney informed the Town that, on the recommendation of his doctor, Cullinane would not participate due to ongoing health reasons, including anxiety and digestive problems. ECF 31, ¶ 86; ECF 42-1, at 145:5-146:24; ECF 31-3, ¶ 8. Cullinane subsequently went on leave under the Family and Medical Leave Act ("FMLA") for these health issues on December 18, 2017. ECF 31, ¶ 87; ECF 31-3, ¶ 8; ECF 31-8, at 1. The next day, the Town sent him a letter informing him of his rights and responsibilities under the FMLA and requesting that he return a completed doctor's certification to the Town within 15 days. ECF 31-8, at 2. Cullinane believes that someone provided the form to the Town on his behalf. ECF 42-1, at 152:11-21.

On May 1, 2018, Reine sent town manager Whelan and Foley a memorandum recommending that Cullinane be terminated. ECF 31, ¶ 88; ECF 31-14, at 2. Reine noted that Gardner's investigation "was placed on hold after [Cullinane] provided medical documentation indicating that he was unable to participate in an investigatory interview due to medical reasons," and that he had been placed on FMLA leave while using accrued sick and vacation leave to receive pay during his absence. ECF 31-14, at 2. When that accrued sick and vacation time was exhausted on January 3, 2018, Cullinane had been placed on unpaid leave. *Id.* Cullinane's entitlement to FMLA leave expired on March 25, 2018, and his medical documentation expired around March 26, 2018. *Id.* Since then, Reine reported, the Town's efforts to contact Cullinane to request more information about his medical status and availability had been unsuccessful. *Id.* at 2-3.

Foley subsequently sent Cullinane a letter informing him of Reine's recommendation, which was "based on job abandonment (unauthorized leave and failure to communicate with the Town)," and noted that the recommendation was "without prejudice to the fact that there is still an open investigation in which [Cullinane] [was] involved." ECF 31, ¶¶ 88-89; ECF 31-9, at 1. The

letter stated that Whelan would be conducting an informal hearing on May 10, 2018 to consider whether Cullinane should be terminated, and it advised Cullinane of his rights to appear, argue against termination, and bring an individual (though not an attorney) to observe the hearing. ECF 31, ¶¶ 89-90; ECF 31-9, at 1.

Cullinane did not attend the hearing. Instead, on May 10, 2018, his counsel submitted a resignation on his behalf, stating that "Scott Cullinane is voluntarily resigning his position with the town." ECF 31, ¶ 92; ECF 42-7, at 3.

## IV.    **Procedural History.**

Cullinane filed this suit against the Town in Middlesex Superior Court on October 15, 2020. ECF 7, at 3-4. His complaint asserted a single claim of retaliation against the Town under the Massachusetts Wage Act, M.G.L. c. 149, § 148A. *Id.* at 15, ¶¶ 76-81. On September 13, 2022, the Massachusetts Appeals Court held that the Wage Act's antiretaliation provision does not waive the sovereign immunity of governmental employers. *See Harrison v. Mass. Bay Transp. Auth.*, 101 Mass. App. Ct. 659, 663-65 (2022). The Town promptly filed a motion for judgment on the pleadings on Cullinane's claim, which was granted on June 27, 2023, with leave to amend. ECF 7, at 136-45.

Cullinane filed an amended complaint on June 30, 2023. ECF 2-3. That pleading asserted several new claims: wrongful termination in violation of public policy (Count I); retaliation in violation of the FLSA, 29 U.S.C. § 215(a)(3) (Count II); and, pursuant to 42 U.S.C. § 1983, violations of Cullinane's First Amendment right against retaliatory arrest and Fourteenth Amendment procedural and substantive due process rights (Count III). ECF 2-3, ¶¶ 80-108. After the Town removed the case to this Court and the parties exchanged discovery, the Town moved for summary judgment. ECF 22.

**STANDARD OF REVIEW**

Summary judgment is appropriate when, based upon the record, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). To prevail, the moving party must show that "there is no factual determination which a 'rational factfinder' could make as to the 'existence or nonexistence' of a fact that 'has the potential to change the outcome of the suit.'" *Gibson Found., Inc. v. Norris*, 88 F.4th 1, 5 (1st Cir. 2023) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010)). Courts "must consider the record and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant," but "need not credit 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Dixon-Tribou*, 86 F.4th at 458 (quoting *Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 333 (1st Cir. 2022)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986).

**DISCUSSION**

## I.    FLSA Retaliation Claim.

Cullinane asserts that after he complained about the Town's refusal to pay overtime wages due to him under the Fair Labor Standards Act, the Town retaliated against him by using the scrap metal episode to spur a police investigation into him and place him on administrative leave. The FLSA sets out wage, hour, and overtime standards so as to "prohibit 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general

well-being of workers.'" *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11 (2011) (quoting 29 U.S.C. § 202(a)). Enforcement of the FLSA is effectuated through "'information and complaints received from employees seeking to vindicate rights claimed to have been denied.'" *Id.* (quoting *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)).

The FLSA's antiretaliation provision, set forth at 29 U.S.C. § 215(a)(3), "makes this enforcement scheme effective by preventing 'fear of economic retaliation' from inducing workers 'quietly to accept substandard conditions.'" *Id.* (quoting *Mitchell*, 361 U.S. at 292). Under that provision, an employer may not "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). A plaintiff asserting a claim of unlawful retaliation under the FLSA must demonstrate that "(1) [he] engaged in a statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as reprisal for having engaged in protected activity." *Claudio-Gotay v. Becton Dickinson Caribe, Ltd*, 375 F.3d 99, 102 (1st Cir. 2004).

The Town contends that Cullinane cannot satisfy the first step of this test by establishing that he engaged in statutorily protected activity. To engage in an activity protected by the FLSA, an employee must "'file . . . an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.'" *Id.* (quoting *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996)). While this standard is satisfied when an employee lodges a sufficient complaint with his employer, *id.* at 103, "not all abstract grumblings will suffice to constitute the filing of a complaint with one's employer," *Valerio v. Putnam Assocs. Inc.*, 173 F.3d 35, 44 (1st Cir. 1999). A complaint to an employer can be made orally, rather than

in writing, but it must be "sufficiently clear and detailed" such that "a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act." *Kasten*, 563 U.S. at 14 (quotation marks and brackets omitted).

Cullinane argues that the three conversations he had with Town employees—assistant superintendent Baldinger, supervisor of public works Flynn, and human resources director Foley—about his overtime pay for the tree removal calls qualify as "complaints" that are statutorily protected under the FLSA. Although Cullinane did not specifically point to the FLSA in these conversations, a jury could reasonably find that his requests for eight hours of overtime pay were "sufficiently clear and detailed" to put a reasonable employer on notice that he was invoking the protection of that statute. *Kasten*, 563 U.S. at 14; *see Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018) (complaint need not reference the FLSA explicitly). The morning after Cullinane responded to the two overnight calls, Baldinger threw his time sheet in front of him and told him "I'm not effing paying you for this," to which Cullinane responded that he "had performed work for the Town and that [he] needed to be paid for that work," and that "it was illegal for the Town not to pay" him the overtime wages. ECF 31-3, ¶ 3; ECF 42-1, at 79:6-80:1. Cullinane repeated this complaint to Flynn, arguing that he "came to work twice for the Town of Concord and . . . should be paid for this." ECF 42-1, at 87:9-88:2. Flynn then directed him to Foley, the human resources director, who could not recall exactly what Cullinane told her, but did remember that Cullinane had not been paid when he spoke to her. *Id.* at 88:7-12; ECF 31-5, at 30:8-31:8. Thus, Cullinane expressed repeatedly to his superiors at DPW that he had not been paid overtime wages owed to him, and he specifically told Baldinger that failing to pay him for this work was "illegal." ECF 31-3, ¶¶ 2-3. A reasonable jury could find such pointed complaints sufficient to put

the Town on notice that Cullinane was asserting his right to overtime pay under the FLSA. *See Valerio*, 173 F.3d at 45 (citing with approval *E.E.O.C. v. Romeo Community Schools*, 976 F.2d 985, 989-90 (6th Cir. 1992), which held that an employee who complained that her employer was "breaking some sort of law" by paying her lower wages had "effectively set forth a claim of retaliation" under the FLSA).

The Town disagrees, contending that it always intended to pay Cullinane four hours of overtime pay, and that the only dispute was whether it would pay him eight hours of overtime pay. But the question is not, as the Town contends, whether the employer intended to comply with the FLSA. The question is whether "a reasonable, objective person would have understood the employee to have put the employer on notice that the employee [was] asserting statutory rights under the Act." *Kasten*, 563 U.S. at 14 (quotation marks and brackets omitted). And a reasonable, objective person could, on these facts, have understood Cullinane to put the Town on notice of his assertion of his right to overtime wages under the FLSA. Regardless of what they intended to do, there is no evidence that Baldinger, Flynn, or Foley ever clarified to Cullinane, at the time of his complaints, that he would receive any overtime pay. Cullinane did not know whether he would be paid *at all* for the calls until a week later, when Reine, Flynn, Rowley, and Baldinger told him at a meeting that the Town would pay him for two calls. ECF 31-3, ¶ 6. And whether he was in fact entitled to four or eight hours of overtime pay under the FLSA is not dispositive, because the antiretaliation provision "also protects employees who articulate a good faith, though unproven, belief that the employer is violating their rights under the FLSA." *McKenzie*, 94 F.3d at 1486. Viewed in the light most favorable to Cullinane, this record could lead a jury to find that Cullinane engaged in protected activity because his complaints reasonably put the Town on notice that he was invoking his rights to be paid overtime wages he believed he was owed under the FLSA.

The Town does not dispute, with respect to the second element, that Cullinane was subject to adverse employment actions when it referred him to the Concord Police Department in connection with the scrap metal episode and then placed him on paid administrative leave.[2] And, with respect to the third element, a reasonable jury could find that these adverse employment actions would not have occurred but for Cullinane's protected conduct. The temporal proximity between these events—about five weeks between Cullinane's October 30, 2017 complaints and the Town's December 7, 2017 decision to refer him to the police and place him on leave—can give rise to an inference of causation. *See Shaffer v. IEP Techs., LLC*, 557 F. Supp. 3d 191, 210 (D. Mass. 2021) (explaining that "[t]emporal proximity can support an inference of causation," and that "[c]ase law finding that temporal proximity alone supported an inference of retaliation has permitted a gap of just a few months between an employee's protected conduct and adverse employment action against him"). The record also contains evidence that shortly after Cullinane voiced his overtime pay complaints, the Town deviated from its standard practice of allowing employees to repurpose trashed scrap metal and other town materials by initiating the police investigation and placing him on leave. ECF 31, ¶¶ 73, 93; ECF 42-1, at 119:6-15; ECF 31-6, at 16:9-18:14. Seen in the light most favorable to Cullinane, the Town's adverse actions could reasonably be construed as retaliation for Cullinane's protected conduct. The Town's motion will, accordingly, be denied as to Cullinane's FLSA retaliation claim.

---

[2] Cullinane conceded at the summary judgment hearing that his arrest, which was effectuated by members of the Concord Police Department, was not an adverse employment action taken by the Town. Nor does Cullinane's May 10, 2018 resignation from the Town constitute an adverse employment action for purposes of his FLSA claim because, as will be explained, his resignation was not a constructive discharge under federal or state law.

## II.    <u>Wrongful Termination Claim.</u>

Cullinane next asserts that the Town wrongfully terminated his employment in violation of public policy. Although an at-will employee like Cullinane traditionally can "be terminated for any reason or for no reason," *Harrison v. NetCentric Corp.*, 433 Mass. 465, 478 (2001), the "public policy exception" to this rule protects employees who are fired for "asserting a legally guaranteed right," "doing what the law requires," "refusing to do what which the law forbids," and "performing important public deeds, even though the law does not absolutely require the performance of such a deed." *Meehan v. Med. Inf. Tech., Inc.*, 488 Mass. 730, 733 (2021) (citations omitted); *see Williams v. Kennedy*, 38 F. Supp. 3d 186, 198 (D. Mass. 2014) (elements of a wrongful termination claim). Seeking to invoke this exception, Cullinane contends that the Town constructively discharged him from his job because he asserted his right to overtime pay. The Town responds that Cullinane voluntarily resigned from his job after abandoning it, and that no reasonable jury could find that he was constructively discharged.

Under Massachusetts and federal law, a constructive discharge occurs where "'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34 (1995) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)); *accord Greenberg v. Union Camp Corp.,* 48 F.3d 22, 27 (1st Cir.1995). "The test is met if, based on an *objective* assessment of the conditions under which the employee has asserted he was expected to work, it could be found they were so difficult as to be intolerable." *GTE Prods. Corp.*, 421 Mass. at 34. To "withstand summary judgment," a plaintiff must "point to evidence in the record showing that just such conditions existed." *Gerald v. Univ. of Puerto Rico*, 707 F.3d 7, 25 (1st Cir. 2013). The analysis does not focus on "an employee's subjective beliefs, no matter how sincerely held." *Id.* (quotation marks omitted).

14

Here, the record shows that, at the time of Cullinane's resignation on May 10, 2018, he had not performed his job for the Town for five months. Due to medical reasons, Cullinane had not participated in Gardner's December 13, 2017 investigatory interview and had been on FMLA leave from December 18, 2017 to March 25, 2018. ECF 31, ¶¶ 86-87; ECF 31-14, at 2. The medical documentation supporting his FMLA leave had expired on March 26, 2018. ECF 31-14, at 2. After that time, the Town had made multiple attempts to contact him, both directly and via counsel, regarding his medical status and availability, but Cullinane did not respond to this outreach or request a continuation of his leave. *Id.* at 2-3. When Reine recommended on May 1, 2018 that Cullinane be terminated due to abandonment of his job, the Town had not yet formally advised Cullinane that he could return to work, because Gardner's investigation was ongoing, and Cullinane remained subject to the no-trespass order. ECF 31, ¶ 91; ECF 31-3, ¶ 10. But the Town did invite Cullinane to participate in an informal hearing on May 10, 2018 concerning whether he should be terminated for job abandonment. ECF 31-9. Rather than attend the hearing, Cullinane, via his counsel, wrote to inform the Town that he was "voluntarily resigning his position." ECF 42-7, at 3. Cullinane later testified that he resigned due to "[h]ealth issues." ECF 42-1, at 151:11-12.

Viewed in the light most favorable to Cullinane, a reasonable jury could not conclude that these working conditions were so intolerable as to compel an objectively reasonable employee in Cullinane's shoes to resign. *GTE Prods. Corp.*, 421 Mass. at 34. Cullinane had not performed work for the Town for five months. Although he remained under an independent investigation regarding the December 2017 scrap metal episode, he had not participated in the investigatory process, had ceased communicating with the Town, and chose not to attend the May 2018 hearing on whether he had abandoned his job. *See id.* at 36 ("Part of an employee's obligation to be *reasonable* is an

obligation not to assume the worst, and not to jump to conclusions too fast." (quotation marks omitted)). Cullinane had, undoubtedly, been subject to a distressing experience in connection with the scrap metal episode: he had been arrested and charged with larceny, a charge that was later dropped, and he was placed on administrative leave. But a "single, isolated act of an employer (or an agent of the employer) usually will not be enough to support a constructive discharge claim." *Id.*; *see Williams*, 38 F. Supp. 3d at 198. And the five-month interval between the scrap metal episode and Cullinane's resignation significantly undercuts his claim that he felt compelled to resign, because "[i]f a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." *Gerald*, 707 F.3d at 26 (citing cases explaining that six- and seven-month delays between the harassing acts and resignation were too long to support a constructive discharge claim).

The evidence of Cullinane's subjective beliefs regarding his reasons for resigning has shifted over time. The May 10, 2018 letter from his attorney stated only that Cullinane was "voluntarily resigning his position with the town." ECF 42-7, at 3. It contained no indication that Cullinane was resigning to avoid retaliation or that he feared that attending his termination hearing would violate his no-trespass order. *Id.* At his August 15, 2024 deposition, Cullinane testified that he resigned due to "[h]ealth issues." ECF 42-1, at 151. Elaborating, he explained that he had been experiencing "nausea, diarrhea, [and] not a clear head," which were not compatible with a "job [in which he] was 80 feet in the air on a daily basis." *Id.* He did not indicate that he felt compelled to resign because he had been subject to difficult or unpleasant working conditions. Later, in a declaration signed on February 10, 2025, Cullinane switched tacks, averring that he resigned because he "was afraid to return" to his workplace and "feared that the Town would continue to

attempt to prosecute [him] for taking the trashed metal or take other retaliatory action against [him]." ECF 31-3, ¶ 11.

Cullinane's shifting accounts of his reasons for resigning cannot create a dispute of material fact that justifies resolution by the jury, because the standard for constructive discharge is objective, not subjective. *See Gerald*, 707 F.3d at 25; *Marrero v. Goya of Puerto Rico Inc.*, 304 F.3d 7, 28 (1st Cir. 2002); *GTE Prods. Corp.*, 421 Mass. at 34. And this record, viewed in the light most favorable to Cullinane, does not demonstrate that his working conditions in May 2018 had become so intolerable that a reasonable employee in his place would have felt forced to resign. Because Cullinane was not constructively discharged, but rather resigned voluntarily from his position, the Town is entitled to summary judgment on his wrongful termination claim.

## III.    **Constitutional Claims.**

Cullinane's final claim against the Town, brought under 42 U.S.C. § 1983, asserts violations of his First Amendment right against retaliatory arrest and Fourteenth Amendment due process rights. His claim is premised on three distinct theories. First, invoking procedural due process, he contends that he was entitled to an opportunity to be heard by Town officials before they referred his potential theft of scrap metal to the Concord Police Department. Second, invoking substantive due process, he argues that the Town failed to properly train its employees on the contours of the FLSA. Third, invoking the First Amendment, he contends that he was subject to an arrest in retaliation for his speech—specifically, his complaints regarding overtime pay. The Court agrees with the Town that each of these theories fails as a matter of law.

In general, a municipality like the Town cannot be held vicariously liable under Section 1983 for the conduct of its non-policymaking employees, but it may be held liable for its own illegal actions. *See Cosenza v. City of Worcester*, 120 F.4th 30, 38 (1st Cir. 2024). To establish this type of so-called *Monell* claim, a plaintiff must demonstrate that he experienced an underlying

constitutional violation; that the municipality, "through its *deliberate* conduct, . . . was the moving force behind the injury alleged," *Bd. of Cnty. Comm'rs of Bryan Cnty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997) (quotation marks omitted); and that the illegal action was taken "pursuant to official municipal policy of some nature," *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). An "official municipal policy" may refer to "formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). It may also encompass "decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

With respect to Cullinane's first and third theories of liability, Cullinane fails to identify any municipal policy that caused the alleged procedural due process or First Amendment violations. He appears to assert instead that his arrest by the Concord Police Department was caused by the actions of policymaking officials who failed to conduct a thorough investigation before referring the scrap metal incident to CPD and then induced CPD to arrest him as retaliation for his wage complaints. To establish a *Monell* claim based on the actions of a policymaking official, a plaintiff must show that the decisionmaker had "final authority to establish municipal policy with respect to the action ordered" and made "a deliberate choice to follow a course of action . . . from among various alternatives." *Pembaur*, 475 U.S. at 481, 483. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Id.* at 483. It is a question of state law whether an official

had final policymaking authority. *Id.*; *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

The Town contends that Cullinane failed to demonstrate that any town official involved in the referral to CPD possessed the final authority, under Massachusetts law, to establish the official municipal policy with respect to these alleged violations. Cullinane does not respond to this argument. But on summary judgment, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." *Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000); *see Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020) (granting summary judgment to municipality where plaintiff failed to "satisfy his burden to produce evidence that [municipal official] had final policymaking authority"); *Schneider v. Loc. 103 I.B.E.W. Health Plan*, 442 F.3d 1, 3 (1st Cir. 2006) (failure to respond to arguments in motion for summary judgment deemed waived). Cullinane has introduced no evidence or argument regarding the scope of authority possessed by Holt, Rowley, Reine, Foley, and Whelan—the officials involved in making the referral to CPD—under state law. Thus, setting aside whether Cullinane's theories even state an underlying constitutional violation, Cullinane fails to establish that the Town acted pursuant to the policy of any official with final policymaking authority. The Town is, accordingly, entitled to summary judgment on Cullinane's claim that the alleged deprivation of his procedural due process and First Amendment rights was caused by official municipal policy.

Cullinane's second theory asserts that the Town's failure to train its employees on the FLSA amounted to official municipal policy that deprived him of his rights. To establish a *Monell* claim on this theory, he must show "'that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the

unconstitutional effects of those inadequacies.'" *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025) (quoting *Cosenza*, 120 F.4th at 38). "Typically, '[a] pattern of similar constitutional violations by untrained employees' is necessary to demonstrate deliberate indifference." *Cosenza*, 120 F.4th at 38 (quoting *Connick*, 563 U.S. at 62). But "in very rare cases," such a pattern "may not be needed so long as the violation . . . is a highly predictable consequence of a failure to equip [governmental actors] with specific tools to handle recurring situations." *Wadsworth*, 129 F.4th at 68 (quotation marks omitted). Here, Cullinane argues that the Town showed deliberate indifference to his substantive due process rights by failing to institute training on the FLSA after the Town settled a prior case with Sylvia Toumayan, a CPD officer who brought a lawsuit in 2015 asserting FLSA claims, including for retaliation, against the Town. *See* ECF 31, ¶¶ 95-100; ECF 31-16, ¶¶ 69-78.

For multiple reasons, the Town is entitled to summary judgment on this theory. First, Cullinane does not explain how the failure to train employees on the parameters of the FLSA amounts to a *constitutional* violation. "The substantive component of due process protects against certain government actions regardless of the fairness of the procedures used to implement them." *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 880 (1st Cir. 2010) (quotation marks omitted). "[T]o establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property" and then demonstrate that "the deprivation of this protected right was caused by governmental conduct." *Rivera v. Rhode Island*, 402 F.3d 27, 33-34 (1st Cir. 2005). Protected rights are those "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks omitted). Cullinane does not identify any protected substantive due process right implicated by his failure to train theory. And to the extent he argues that retaliatory

conduct under the FLSA itself implicates substantive due process rights, the First Circuit has made clear that "the FLSA is the exclusive remedy for enforcement of rights created under the FLSA." *Roman v. Maietta Const., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998); *see also Kendall v. City of Chesapeake*, 174 F.3d 437, 440-43 (4th Cir. 1999) (noting that "the FLSA provides an unusually elaborate enforcement scheme" and finding it "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory enforcement mechanisms," including a private right of action (quotation marks omitted)).

Second, the record does not demonstrate a triable issue regarding deliberate indifference. The record shows that the Town did not specifically train its supervisors on the FLSA or the Wage Act, but it did train supervisors on their substantive duties regarding payroll and overtime. ECF 31, ¶¶ 95-96. Supervisors learned, among other things, that employees must earn overtime wages for time worked above 40 hours per week, and that the Town offers employees paid leave and vacation time. *Id.* ¶ 96. The record also shows that the Town received one complaint from a police officer in 2015 who claimed that she had not been paid for all time spent working. *Id.* ¶¶ 97-100; ECF 31-16, ¶¶ 69-78. No reasonable jury could conclude, on this record, that the Town knew or should have known that its training regarding employees' rights to overtime pay was inadequate and nevertheless exhibited deliberate indifference to the unconstitutional effects of that lack of training. *Wadsworth*, 129 F.4th at 68. Even though the Town did not train its employees on the contours of the FLSA, it did provide training on employees' rights to overtime wages. And a single prior FLSA complaint that ended in a settlement does not, without more, demonstrate a "pattern of similar constitutional violations by untrained employees," such that a jury could reasonably find deliberate indifference, or that retaliation is a recurring situation in the Town. *Cosenza*, 120 F.4th

at 38 (quotation marks omitted). The Town is, accordingly, entitled to judgment on Cullinane's Section 1983 claim.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the Town's motion for summary judgment, ECF 22, is GRANTED with respect to Counts I and III of the amended complaint and DENIED with respect to Count II.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 23, 2025